UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,            )
                                     )
            v.                       )    Cr. No. 06-10416-MLW
                                     )
ARNOLD ANDREWS,                      )
        Defendant.                   )

MEMORANDUM AND ORDER

WOLF, D.J.                                        March 8, 2012

        This memorandum is based on the transcript of the decision
rendered orally on December 20, 2011, in which the court allowed
the defendant's motion to suppress and motion to amend the motion
to suppress. This memorandum adds some citations, clarifies some
language, and refines some discussion.

I. SUMMARY

        I have reached the following conclusions concerning defendant
Arnold Andrews' original motion to suppress and request to amend
that motion.

        The search warrant for 452 Kempton Street, New Bedford,
Massachusetts, was validly issued. Andrews had a Fourth Amendment
interest in that property. Pursuant to Michigan v. Summers, 452
U.S. 692 (1981), Andrews' Fourth Amendment rights were not violated
by his detention in connection with the search. Therefore, his
statements at 452 Kempton Street are not subject to suppression for
a Fourth Amendment violation. However, the government has not
satisfied its burden of proving that the defendant's statements at

1

452 Kempton Street, made after guns were found, were voluntary. Therefore, the motion to suppress those statements is being allowed, and the statements are being excluded from the government's case-in-chief because the defendant's Fifth Amendment rights were violated.

Finally, I am also allowing the defendant's untimely motion to amend the motion to suppress because I find that the suppression motion is meritorious, and defense counsel might be deemed ineffective if the plain view issue was not raised and decided in these proceedings. Therefore, there is good cause to permit the late filing concerning the plain view issue. With regard to the merits, I find that the government has not proven that the plain view exception to the warrant requirement justified the seizure of certain documents during the search of 452 Kempton Street. Therefore, those documents are also being excluded.

## II. THE MOTION TO SUPPRESS ANDREWS' STATEMENTS

### A. The Fourth Amendment

With regard to the Fourth Amendment issues, I find that Andrews had a Fourth Amendment interest in the apartment at 452 Kempton Street, New Bedford, Massachusetts, on September 7, 2006. His September 27, 2007 affidavit in support of the motion to suppress states that he had lived there, that he still had a key, that he could come and go whenever he wanted, and that he stored certain items, like clothes, at 452 Kempton Street. Therefore,

Andrews had a Fourth Amendment interest in the apartment and can seek suppression of the evidence seized there. See, e.g., United States v. Aquirre, 839 F.2d 854, 856-57 (1st Cir. 1988); United State v. Gomez, 770 F.2d 251, 254-55 (1st Cir. 1985).

1. Validity of Search Warrant

Contrary to the defendant's contention, I find that the search warrant was valid. The court reviews the validity of the warrant by examining whether there was a substantial basis for the magistrate judge's decision that there was probable cause for its issuance. See United States v. Dessesaure, 429 F.3d 359, 368 n.8 (1st Cir. 2005). I find that, in this case, there was. The affidavit was based, in part, on information from a confidential informant. It provided the magistrate the information necessary to allow him to assess the informant's credibility. It stated that the New Bedford Police Department (the "NBPD") knew the informant. It disclosed his criminal record. It stated that the informant had previously provided information that led to an arrest and seizure of firearms and narcotics.

The affidavit provided the informant's description of the apartment, based on his personal knowledge. It also described firearms that the informant said he saw Andrews possess, at the apartment, within the preceding 72 hours. This was first-hand information linking illegal activity to the place to be searched, because Andrews was a felon and, under federal law, could not

lawfully possess a firearm. See United States v. Barnard, 299 F.3d 90, 94 (1st Cir. 2002) (finding that the "first-hand details" provided by confidential informant about defendant's house and the types of guns possessed by defendant "provide some assurance of reliability"); United States v. Taylor, 985 F.2d 3, 6 (1st Cir. 1993) ("[T]he affidavit may disclose an adequate basis for evaluating the informant's veracity through the very specificity and detail with which it relates the informant's first-hand description of the place to be searched or the items to be seized." (emphasis original)). In addition, as the affidavit stated, Andrews did not have a Firearm Identification Card ("FID card").

The informant described Andrews and there was information in the NBPD file that supported the conclusion that the person described was Andrews. The NBPD found that Andrews had prior firearms and narcotics convictions. Therefore, there was probable cause to support the issuance of a warrant. In addition, the officers were entitled to rely on it in good faith. See United States v. Leon, 468 U.S. 897, 926 (1984).

### 2. Seizure of Andrews

I also find that the seizure of Andrews did not violate his Fourth Amendment rights.

### (a) Legal Standards

The Fourth Amendment requires that any search or seizure be reasonable. See U.S. Const. amend. IV; Michigan v. Fisher, 130 S.

Ct. 546, 548 (2009). A warrant is usually required to make a seizure reasonable and warrantless searches and seizures are presumptively unreasonable. *See* *id.* However, there are some exceptions to the warrant requirement. *Summers*, *supra*, provides the exception to the warrant requirement that is relevant in this case.

*Summers* involved a warrant for contraband, not for mere evidence of a crime. *See* 452 U.S. at 705, nn.20, 21; *Leveto v. Lapina*, 256 F.3d 156, 168 (3d Cir. 2001) (Alito, J.) (noting that the *Summers* Court did not decide whether the rule that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted" applies if the warrant authorizes a search for mere evidence, rather than contraband). In *Summers*, the Supreme Court held that it might be reasonable to detain an occupant leaving the place to be searched in order to serve certain law enforcement interests. *See* 452 U.S. at 699-700. These interests include: (1) preventing the flight of a suspect; (2) protecting officers' safety; and (3) facilitating an orderly search. *Id.* at 702-703. The Supreme Court also specifically noted that a *Summers* detention was not likely to be exploited by the police officers to gain incriminating information. *Id.* at 701.

Therefore, the Supreme Court held in *Summers* that, for Fourth Amendment purposes, a warrant to search for contraband, founded on probable cause, implicitly provides the limited authority to detain

the occupants of the premises while a proper search is conducted. Id. at 705. The Court did not decide whether this rule would apply if the warrant authorized only a search for evidence rather than contraband, if the detention was prolonged, or if other special circumstances existed. Id. at 705 nn.20, 21; see also Leveto, 256 F.3d at 168 (noting these limitations on the Summers rule).

The Supreme Court amplified Summers in Muehler v. Mena, 544 U.S. 93 (2005). There, the Court stated that, "[a]n officer's authority to detain incident to a search is categorical." Id. at 98. The Court also found that the government's interest in detaining and handcuffing an occupant is at its maximum when the warrant authorizes the search for weapons possessed by a suspected gang member, which is the situation in the instant case. Id. at 100. However, the Court also noted that the circumstances of a lawful detention, such as its extended duration, could cause the detention to become unreasonable. Id.

The Supreme Court again addressed a Summers detention in Los Angeles County, California v. Rettele, 550 U.S. 609 (2007). The Court wrote that, "[t]he test of reasonableness under the Fourth Amendment is an objective one." Id. at 614. It reiterated, however, that "special circumstances," such as "a prolonged detention," might render a Summers seizure unreasonable. Id. at 615.

The holding in Rettele that the Summers test is one of objective reasonableness is consistent with the Supreme Court's

decision in <u>Brigham City, Utah v. Stuart</u>, 547 U.S. 398 (2006). In <u>Brigham City</u>, the Supreme Court held that "[a]n action is reasonable under the Fourth Amendment regardless of the individual officer's state of mind as long as the circumstances, viewed <u>objectively</u>, justify the action. The officer's subjective motivation is irrelevant." <u>Id.</u> at 404 (emphasis original) (internal citations omitted). <u>Brigham City</u> also explicitly distinguished administrative searches, stating:

> As respondents note, we have held in the context of programmatic searches conducted without individualized suspicion – such as checkpoints that combat drunk driving or drug trafficking – that an inquiry into programmatic purpose is sometimes appropriate . . . . But this inquiry is directed at ensuring that the purpose behind the program is not ultimately indistinguishable from the general interest in crime control. It has nothing to do with discerning what is in the mind of the individual officer conducting the search.

<u>Id.</u> at 405 (internal quotations and citations omitted).

In 2009, the Supreme Court again held that warrantless searches and seizures are generally to be evaluated for objective reasonableness. In <u>Michigan v. Fisher</u>, the Court held that:

> The emergency aid exception [to the warrant requirement] does not depend on the officer's subjective intent or the seriousness of any crime they are investigating when the emergency arises. It requires only an objectively reasonable basis for believing that a person within the house is in need of immediate aid.

130 S. Ct. at 548 (internal quotations and citations omitted).

Therefore, in the foregoing cases, the Supreme Court answered the question left open in <u>Whren v. United States</u>, 517 U.S. 806, 813

(1996), of whether a balancing test in which the subjective motives of officers are weighed, rather than an objective reasonableness test, is applicable to warrantless searches and seizures based on less than probable cause. The Court has held that objective reasonableness is the proper test.

The First Circuit precedents concerning <u>Terry</u> stops, which are a form of detentions based on less than probable cause, reflect the understanding that warrantless searches and seizures based on less than probable cause must be judged objectively, without regard to subjective motives. For example, the First Circuit wrote in <u>Bolton v. Taylor</u> that, "[w]hether a reasonable suspicion exists is treated as an objective inquiry; the actual motive or thought process of the officer is not plumbed." 367 F.3d 5, 7 (1st Cir. 2004). Similarly, in <u>United States v. Ruidiaz</u>, the First Circuit wrote that, "[r]easonableness in this context is a construct that must be judged according to objective criteria; it is not dependent on an individual officer's subjective motives." 529 F.3d 25, 29 (1st Cir. 2008).

As the Tenth Circuit has explained, objective reasonableness is a lower standard than probable cause. For example, in <u>United States v. Porter</u>, the Tenth Circuit wrote, in addressing the emergency aid exception to the warrant requirement, that:

> [The] test is twofold, whether (1) the officers have an objectively reasonable basis to believe there is "medical assistance needed . . . . or persons are in danger"; and (2) "the manner and scope of the search is reasonable" .

> . . . Reasonable belief does not require absolute certainty. The standard is more lenient than the probable cause standard.

594 F.3d 1251, 1258 (10th Cir. 2010) (internal citations omitted).

Similarly, in United States v. Najar, the Tenth Circuit, again addressing the emergency aid exception, explained that in Brigham City the Supreme Court rejected the previous requirement of "some reasonable basis, approaching probable cause" to associate the emergency with the place to be searched. 451 F.3d 710, 718 (10th Cir. 2006). It wrote:

> Neither did the Court require probable cause in this type of exigent circumstances. Thus, our test is now twofold, whether (1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable.

Id.

Therefore, the proper test for determining whether a Summers detention was permissible in the instant case is whether, based on the proven facts and circumstances, the detention was objectively reasonable, and the officers' subjective intent should not be considered. If there is not an objectively reasonable basis for finding the existence of any of the law enforcement interests that justify the Summers exception to the warrant requirement, the exception does not apply. This is essentially the reasoning of United States v. Edwards, 103 F.3d 90 (10th Cir. 1996), a case decided in 1996 by the Tenth Circuit before the Supreme Court decided Mena, Rettele, and Brigham City.

As several courts have held, if there is an objectively reasonable basis for finding that one or more of the <u>Summers</u> law enforcement interests exist, the fact that, in contrast to <u>Summers</u>, the person was not detained as he left the premises to be searched, does not render his seizure unreasonable. <u>See, e.g.</u>, <u>United States v. Cochran</u>, 939 F.2d 337, 338 (6th Cir. 1991); <u>United States v. Head</u>, 216 F. App'x 543, 546 (6th Cir. 2007); <u>United States v. Cavazos</u>, 288 F.3d 706, 712 (5th Cir. 2002).

(b) <u>The Facts Relating to the Seizure of Andrews</u>

A warrant was issued that authorized a search for "[a]ny and all firearms, ammunition, and ballistic related items. To include a .357 chrome revolver and a 22 caliber chrome handgun." Ex. 4. It authorized this search to occur at "452 Kempton Street in New Bedford, Massachusetts," and stated that the apartment at 452 Kempton Street "is occupied by and/or in the possession of Arnold Andrews." <u>Id.</u> It also authorized the search for firearms "on the person or in the possession of Same as Above," evidently referring to Andrews, the only person named in the warrant. <u>Id.</u> The warrant further stated that, "[y]ou are also commanded to search any person present who may be found to have such property in his or her possession or under his or her control or to whom such property may have been delivered." <u>Id.</u>

The search warrant was executed on September 7, 2006, by officers of the NBPD and agents of the Bureau of Alcohol, Tobacco,

Firearms, and Explosives (the "ATF"). During the preceding month, one officer, then-NBPD Sergeant Paul Oliveira, had observed Andrews exiting the apartment at 452 Kempton Street on at least one occasion. NBPD Officer David Brown had also seen Andrews entering and exiting the apartment on at least one other occasion.

Sometime before 2:00 p.m. on September 7, 2006, NBPD Detectives Tyrone Jones and Kurt Dreher began surveillance of the apartment. Pursuant to standard policy, it was their intention to wait for Andrews to come to the apartment before executing the search warrant. They were parked in a lot approximately 50 yards from the apartment's front door. Within the United Front Project, the apartment is located in Building J. There are no spaces between the units in Building J, but each unit has its own front and rear entrance. From where Jones and Dreher were conducting surveillance, they could not see the rear of Building J. Therefore, they could not tell if a person emerging from behind Building J had exited a particular unit or whether the person had exited Building J at all.

Shortly after beginning surveillance, Jones observed Andrews emerge from behind Building J and enter a red car. Jones lost sight of the car, but was informed by radio that other NBPD officers had observed the car circle the block and let Andrews out on Chancery Street. Jones then observed Andrews return on foot to the front of Building J, converse briefly with several other men, separate from those men, and walk behind Building J. Jones and Dreher continued

their surveillance until about 5:00 p.m., at which point they learned that Andrews had been detained by other officers. At no time on September 7, 2006, did Jones, Dreher, or any other NBPD or ATF officer observe Andrews enter or exit the apartment at 452 Kempton Street before Andrews was handcuffed and transported there by the officers.

While Jones and Dreher were conducting surveillance, at about 3:00 p.m., NBPD officers and ATF agents held an operations meeting in preparation for the execution of the search warrant. Their plan was to locate and detain Andrews away from the apartment before executing the search warrant. This plan was consistent with the NBPD's standard practice of seizing the target of a search warrant prior to executing the search, transporting the target to the premises to be searched, and keeping the target there for the duration of the search. One reason for this practice was the desire to attempt to question the target during the search, particularly if contraband was found. The officers, generally and in this case, hoped that the target would make an inculpatory statement linking himself to any contraband found.

There were, however, other reasons for the practice of waiting to detain the target, in this case Andrews, before executing the warrant or starting the search. One such purpose was protecting officer safety. The practice of the NBPD, employed by it and the ATF in this case, was intended, in part, to assure that the

defendant was not in an apartment where they had probable cause to believe there was a gun.

In addition, pursuant to their usual practice, the officers wanted to detain Andrews to ask if there was anyone else in the apartment, whether there were dogs in the apartment, and whether Andrews had a key which could facilitate the search. Facilitating the search was another purpose for the NBPD's general practice, which it followed in this case. More specifically, the officers wanted to ask Andrews if he had a key, which would facilitate getting into the apartment. The officers also wanted to ask Andrews if there were drugs or guns in the apartment, hoping that Andrews would make statements that would help them find contraband that might be hidden in the apartment and link him to it. Protecting officer safety and facilitating a search are two legitimate law enforcement purposes under <u>Summers</u>. <u>See</u> 452 U.S. at 702-703. It has been proven that these purposes existed in this case.

Some time after the operations meeting, Brown and NBPD Detective Danny Amaral, having been dispatched to the corner of Cedar and Elm Streets, and having subsequently been relocated to a surveillance point closer to the 452 Kempton Street apartment, observed Andrews in a parking lot behind the apartment. Andrews was approximately half a block away from the rear of the apartment. Brown estimated that a person could run that distance in less than 30 seconds. Amaral and Brown entered their vehicle, circled the

block to enter the lot where they had observed Andrews, and observed him leaning on a car in the company of a man and a woman. The woman, later identified as Lizette Rivera, was in Andrews' arms. The officers did not detain or demand identification from either Rivera or the man, who remains unidentified. The officers were not concerned that Rivera or the unidentified man would interfere with the execution of the search warrant.

No arrest warrant for Andrews was sought prior to the execution of the search warrant because there was not probable cause to arrest Andrews. However, when Amaral and Brown encountered Andrews, they informed him either that they "had a warrant for him and the apartment," Dec. 6, 2010 Tr. at 247, or that they "had a search warrant for him and his house," id. at 235, or that they "had a warrant for his arrest," Dec. 8, 2010 Tr. at 28. Amaral and Brown then handcuffed and pat-frisked Andrews for weapons. Amaral read Andrews his Miranda rights. Amaral then asked Andrews whether anybody was present in the apartment. Andrews replied that he did not live there, and that he had lived at 154 Eugenia Street for approximately one year. Andrews informed Amaral that the apartment at 452 Kempton Street was currently vacant and had not had electricity for approximately three weeks. Andrews also informed Amaral and Brown that he did not have keys to the apartment. Amaral then radioed this information to the other officers involved in executing the search warrant.

The search warrant was not executed until Andrews had been taken into custody. Amaral and Brown promptly transported Andrews to the apartment. He was brought inside, where the search was already under way. Jones testified that he believed the apartment appeared "lived-in." Dec. 6, 2010 Tr. at 162. It was furnished and contained photographs and clothes. There were fast food wrappers in the kitchen. A prompt search of Andrews' pockets led to the discovery of a cell phone, keys, and a marijuana cigarette or blunt. The marijuana was found within 10 to 15 minutes of Andrews' initial detention.

Andrews was then seated at a dining room table with his hands cuffed behind him. He remained in that position for the duration of the search. While seated and handcuffed, Andrews was shown a copy of the search warrant and read his <u>Miranda</u> rights. He stated that he understood those rights. At some point he said that the handcuffs were bothering him and they were loosened.

(c) <u>Analysis of the Fourth Amendment Issue</u>

I find that the warrant in this case did not permit a general search of the defendant away from the premises, 452 Kempton Street, although the pat-frisk of him was reasonable. The Massachusetts Supreme Judicial Court decision in <u>Commonwealth v. Santiago</u>, 410 Mass. 737, 741-742 (1991), and Professor LaFave indicate that, in the context of the language in the search warrant in this case, the officers were authorized by the warrant to search Andrews only at

15

452 Kempton Street. See 2 LaFave, Search and Seizure, §4.9(a) ("Sometimes the search warrant which is being executed will describe not only certain premises but also a person. There is no inherent defect in a single warrant which authorizes the search of a place and also a person, and thus a search of the named person when he is found at the place will be a valid search under the warrant.").

The warrant was for contraband, not for mere evidence of a crime. Andrews was a felon and known to be a felon. It was a federal crime for him to possess a gun. See 18 U.S.C. §922(g). In addition, he did not have an FID card. See M.G.L. c. 140, §129C. The search for guns at 452 Kempton Street was a search for contraband in the circumstances of this case.

It was objectively reasonable for the police officers to wait for Andrews to return before they executed the search warrant. They did not have the full manpower to conduct the search until about the time Andrews returned. Moreover, waiting for Andrews to return to the area of the apartment allowed the police officers to assure that he was not in the apartment, possibly with guns, which would have posed a danger to them. Waiting provided the police officers the opportunity to ask the defendant for keys to enter, which would have facilitated the search. Waiting for Andrews to return also assured that he would not return to the vicinity of the apartment, see that the search was in progress, and flee.

It was also objectively reasonable, under the circumstances, for the officers in the parking lot to frisk Andrews quickly for weapons in order to protect their own safety. <u>See, e.g.</u>, <u>Ruidiaz</u>, 529 F.3d at 33 ("Once an officer has formed a reasonable belief that a detained person may be armed and dangerous, a pat-down for protective purposes is, without more, deemed reasonably related in scope to the stop."). In addition, it was objectively reasonable to bring Andrews back to the apartment. Doing so promoted officer safety. The officers did not have probable cause to arrest Andrews in the parking lot. They had good reason to believe that a crowd would gather once the search started, and, in fact, a crowd did gather. It was safer for the police officers to have Andrews inside than out in the parking lot.

It was also objectively reasonable to bring Andrews to the apartment to provide an opportunity for him to facilitate the search by identifying where the guns could be found. It has also been proven that another important reason for returning Andrews to the apartment was the officers' desire to question him in the hope that he would say something incriminating. However, as explained earlier, it is not permissible for the court to weigh this subjective motive in deciding the objective reasonableness of the police officers' conduct. <u>See</u> <u>Rettele</u>, 550 U.S. at 615 ("The test of reasonableness under the Fourth Amendment is an objective one."); <u>Brigham City</u>, 547 U.S. at 405 ("An action is 'reasonable'

under the Fourth Amendment regardless of the individual officer's state of mind as long as the circumstances, viewed <u>objectively</u>, justify [the] action. The officer's subjective motivation is irrelevant.") (emphasis original) (internal quotations and citations omitted).

The conduct in the apartment was also objectively reasonable. Handcuffing the defendant promoted officer safety. The cuffs were loosened when Andrews said he was uncomfortable. There was also the potential for Andrews to provide information to facilitate the search. This case, therefore, contrasts with <u>Edwards</u>, where the defendant was kept on the sidewalk and could not, therefore, have facilitated the search. <u>See</u> 103 F.3d at 91.

Once in the apartment, Andrews was promptly searched. A marijuana blunt was found during that search, within ten minutes of the time Andrews was first detained. As the parties each acknowledge, finding the marijuana provided a basis for the police officers to arrest the defendant pursuant to Massachusetts General Law, Chapter 94C, §§34 and 41C.

It was also objectively reasonable for the officers not to take Andrews to the station immediately after finding the marijuana. Doing so would have diluted the manpower they had to secure the site and conduct the search. This, however, was not their actual motive. Their actual, primary motive was to try to prompt the defendant to make incriminating statements if firearms

or other contraband were found.

The detention at the apartment was not unreasonably long. The firearms were found in a bedroom within 10 to 20 minutes of Andrews' detention. As explained below, the defendant was questioned in a manner that violated the Fifth Amendment and then taken to the police station.

Cases consistent with this court's decision that Andrews' Fourth Amendment rights were not violated include Cochran, 939 F.2d at 338; United States v. Sanchez, 555 F.3d 910, 918 (10th Cir. 2009); Head, 216 Fed App'x at 546; United States v. Sears, 139 F. App'x 162, 166 (11th Cir. 2005); Cavazos, 288 F.3d at 712; and United States v. Harris, No. Cr. 02-10240-GAO, 2004 WL 912809 at *1 (D. Mass. Apr. 26, 2004).

In essence, the detention would have been unreasonable if no Summers objectives or law enforcement interests existed. Edwards is essentially a case in which no such interests were proven. See 103 F.3d at 91. United States v. Reinholz is another such case. See 245 F.3d 765, 778 (8th Cir. 2001).

It is possible that the Eighth Circuit's decision in United States v. Sherrill, 27 F.3d 344, 346 (8th Cir. 1994), is not consistent with the standards I have applied. However, Sherrill was decided in 1994, before the Supreme Court's decisions in Mena (2005) and Rettele (2007). In any event, to the extent that Sherrill is inconsistent with my reasoning, I respectfully do not

find it persuasive.

B. <u>The Fifth Amendment</u>

The defendant's motion to suppress based on the contention that the defendant's statements were involuntary and, therefore, resulted from a violation of his Fifth Amendment rights is meritorious. Accordingly, the statements are being excluded from the government's case-in-chief. <u>See</u> <u>Oregon v. Elstad</u>, 470 U.S. 298, 307 (1985). They may be used on cross-examination to impeach the defendant. <u>Id.</u>

1. <u>Legal Standards</u>

The generally applicable standards concerning the alleged violation of <u>Miranda</u> rights are described in detail in my decision in <u>United States v. Gonzalez</u>, 719 F. Supp. 2d 167, 170-174 (D. Mass. 2010). Of decisive importance in this case is the principle that the government bears the burden of proof concerning a motion to suppress statements that a defendant asserts were made in violation of his <u>Miranda</u> rights. The knowing, intelligent, and voluntary waiver of those rights must be proven by a preponderance of the evidence. <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436, 475 (1966); <u>Colorado v. Connelly</u>, 479 U.S. 157, 168 (1986); <u>Berghuis v. Thompkins</u>, 130 S. Ct. 2250, 2261 (2010).

2. <u>Analysis of the Fifth Amendment Issue</u>

The government has proven that the defendant knew of his <u>Miranda</u> rights. It is admittedly a close question whether it has

20

been proven that Andrews voluntarily decided to waive his right to remain silent and confess that the guns found at 452 Kempton Street were his. However, I am not persuaded that it is more likely than not that the defendant provided that information voluntarily. Therefore, the government has not satisfied its burden of proof. Thus, the statements acknowledging that the guns found belonged to Andrews must be excluded from the government's case-in-chief. See Elstad, 470 U.S. at 307.

The government has proven that the defendant was informed of his Miranda rights and understood them. The defendant was given his Miranda rights twice – first when he was detained in the parking lot and again when he was brought into the apartment. In the apartment, the defendant stated that he understood his Miranda rights. Significantly, the defendant refused to answer questions initially, even after the guns were found. This indicates that the defendant understood that he had a right to remain silent.

The government has not proven, however, that the defendant's waiver of his right to remain silent was, as the Supreme Court said in Moran v. Burbine, "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." 475 U.S. 412, 421 (1986). As the First Circuit has reiterated after Moran, "[t]he voluntariness of an admission depends on whether the will of the defendant [was] overborne so that the statement was not his free and voluntary act,

and that question [is] to be resolved in light of the totality of the circumstances." United States v. Jackson, 918 F.2d 236, 241 (1st Cir. 1990) (internal quotations and citations omitted).

A waiver of Miranda rights is not involuntary unless it involved coercion by the government because "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." Connelly, 479 U.S. at 164. Therefore:

> A defendant's mental state or condition, by itself and apart from its relationship to official coercion, is never dispositive of the inquiry into constitutional voluntariness . . . . Rather, the voluntariness of a waiver of [the Fifth Amendment] privilege has always depended on the absence of overreaching, not on free choice in any broader sense of the word.

United States v. Rojas-Tapia, 446 F.3d 1, 7 (1st Cir. 2006) (internal quotations and citations omitted).

There are some relevant circumstances that weigh in favor of a finding that the defendant's waiver of his right to remain silent was voluntary. Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973), provides examples of relevant circumstances, some of which exist here. Before making the statements at issue, the defendant was read his Miranda rights twice and he understood them. He had also been arrested before, though there is no evidence as to whether he was read his rights, understood them, and/or exercised them on those occasions. The defendant was, however, in a familiar place, the

kitchen of 452 Kempton Street. While there were many officers in the apartment, only one, ATF Special Agent Scott Heagney, questioned him. Although handcuffed, the cuffs were loosened at the defendant's request. The officers did not abuse the defendant physically or verbally. The statements at issue were made within about 30 minutes of the defendant's detention. Until Heagney threatened to arrest the defendant's mother, the defendant was not crying or visibly upset, though Heagney said he looked nervous and concerned. Dec. 8, 2010 Tr. at 115. Another officer said he looked calm. Dec. 6, 2010 Tr. at 161.

However, there are other facts that cause me to conclude that the government has not proven that the statements the defendant made after the guns were found in a room at 452 Kempton Street were voluntary. These facts are as follows.

A primary purpose for bringing the defendant to 452 Kempton Street was to prompt him to make incriminating statements if, as expected, guns were found. In essence, the law enforcement officers exploited a detention that was objectively reasonable under Summers for a purpose that the Supreme Court did not intend to authorize or encourage. See Summers, 452 U.S. at 701. While the officers' intent is not critical, the impact of what they did is significant, and their intent is relevant to the factual findings concerning what they did.

Heagney told Andrews, who was then 22 years old, that he could

be prosecuted in federal court and go to jail for the rest of his life if he did not admit that the guns were his. This description of the potential penalty was false and was known to be false by Heagney. However, the falsity of the threat was not evident to the defendant, who had no prior experience with a federal prosecution. Such distortions of the potential penalties can cause or contribute to a finding that a statement was not made voluntarily. As the Seventh Circuit has written,

> [i]nterrogation becomes constitutionally objectionable [] when the circumstances prevent the person being questioned from making a rational choice. Misrepresentations can do this, by distorting the alternatives among which the person under interrogation is being asked to choose; so can threats that prevent a person from thinking clearly, or that (much like misrepresentations) exaggerate the consequences of one of the alternatives - not confessing.

Weidner v. Thieret, 866 F.2d 958, 963-964 (7th Cir. 1989) (internal citations omitted); see also United States v. Duvall, 537 F.2d 15, 25 (2d Cir. 1976) (statement that charges carried "a possible sentence of a hundred years," when prosecutor knew no judge would impose, and no prosecutor would seek, a sentence remotely approaching a hundred years, was coercive; court suppressed statements made by defendant in response).

Heagney also falsely indicated that he would help the defendant avoid spending the rest of his life in prison if the defendant admitted that the guns were his. Heagney had no intention of trying to have the defendant rewarded if he promptly confessed

and, in fact, he did not do so. See Dec. 8, 2010 Tr. at 76-77, 125-27. This is a form of deceit that the Supreme Court noted in Moran can contribute to undermining the voluntariness of a confession. See 475 U.S. at 421; see also United States v. Lopez, 437 F.3d 1059, 1065 (10th Cir. 2006) ("Under Supreme Court and Tenth Circuit precedent, a promise of leniency is relevant to determining whether a confession was involuntary and, depending on the circumstances, may render a confession coerced."; distinguishing "vague" promises from promises to make cooperation known to the U.S. Attorney or Judge).

Nevertheless, the false threat of a life sentence, and the false promise of assistance in avoiding it, did not cause the defendant to admit the guns were his. See Dec. 8, 2010 Tr. at 129. Rather, the defendant did not confess to possessing the guns until Heagney falsely threatened to arrest the defendant's mother for possessing the guns. Id. at 130. Andrews' mother was elderly, and ill with lupus and fibromyalgia. Id. at 209. Andrews was very close to his mother. Id. After the search began, his mother and several other people came to 452 Kempton Street. Heagney and the defendant could hear Andrews' mother crying throughout the search. Id. at 133.

After the guns were found, Heagney told the defendant that he should "stop disrespecting his mother." Id. at 77-78, 133. Heagney said, "[t]he guns are either yours or your mother's or your

sister's." Id. at 135-36. Heagney intended to cause Andrews to believe that he would arrest Andrews' mother if Andrews did not admit that the guns were his. However, Heagney was not then aware of any basis for arresting Andrews' mother and had no intention of doing so. Id. at 137-41. Nor did his colleagues believe that they had a basis to arrest Andrews' mother, even though one of them, Jones, knew that she did not have an FID card. Id. at 137; Dec. 6, 2010 Tr. at 206. While standing outside with the defendant's mother, Oliveira asked her if there were drugs and guns in the house that belonged to her, and she answered, "[o]f course not." Dec. 6, 2010 Tr. at 122-23.

Based on the totality of all of the known circumstances, including the informant's report that the guns were the defendant's, no prudent person would have believed that Andrews' elderly, ill mother possessed those guns, which were found hidden in a closet in a bedroom that the officers, at that time, had no information indicating had been her bedroom. Therefore, there was not, in any event, probable cause to arrest Andrews' mother, and Heagney knew this. See United States v. Fiasconaro, 315 F.3d 28, 34-35 (1st Cir. 2002) ("Probable cause exists when the facts and circumstances within [the police officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense." (internal quotations and

citations omitted)).

However, the false threat to arrest Andrews' mother had the effect Heagney intended. Andrews immediately said: "Arrest me, not my mother." "Those guns are mine." Dec. 8, 2010 Tr. at 77, 80, 136. Heagney testified that, as Andrews said this, "he bowed his head a little bit, like he had been defeated." Id. at 77. Soon after making these statements, the defendant began to cry, which was extremely unusual for him. Id. at 206-08; 232-33; Dec. 6, 2010 Tr. at 121. When his mother and others came in, the defendant said to his sister, "They threatened to arrest Mommy," or words to that effect. Dec. 8, 2010 Tr. at 208.

Once he was at the police station and his mother was no longer threatened with arrest, Andrews refused to make any further statements. Dec. 6, 2010 Tr. at 167.

As the First Circuit has written: "Certainly some types of police trickery can entail coercion: consider a confession obtained because the police falsely threatened to take a suspect's child away from her if she did not cooperate." United States v. Byram, 145 F.3d 405, 408 (1st Cir. 1998) (citing Lynumn v. Illinois, 372 U.S. 528, 534 (1963) (threats made to suspect that her children's state financial aid would be cut off and her children taken from her if she did not "cooperate" held to be coercive, rendering the confession involuntary); Spano v. New York, 360 U.S. 315, 323 (1959) (causing petitioner's friend to tell him that petitioner had

gotten him into trouble, jeopardized his job, and that the loss of his job would be disastrous to his three children, wife, and unborn child was coercive; court found that petitioner's "will was overborne" and his confession was involuntary)).

The coercive police conduct in this case is not as extreme as the coercive conduct in <u>Lynumn</u> or <u>Spano</u>. <u>See</u> <u>Lynumn</u>, 372 U.S. at 534; <u>Spano</u>, 360 U.S. at 323. However, the instant case is also distinguishable from the key cases on which the government relies. For example, in <u>Jackson</u>, this court's decision was affirmed by the First Circuit, which found that an admission made by the defendant was voluntary where he was truthfully told that his sister was under arrest. <u>See</u> 918 F.3d at 243. In <u>Jackson</u>, there was no proof of any threats or promises made to the defendant, and there was no evidence that the defendant was especially close to his sister or cared about what happened to her. <u>Id.</u> Similarly, in <u>United States v. Charley</u>, there was no evidence of threats. <u>See</u> No. Cr. 03-10387-DPW, 2004 WL 2851947 at *6-8 (D. Mass. Dec. 9, 2004). There, the police offered not to press charges against the defendant's brother and friends if the defendant admitted that the gun found in his car belonged to him. <u>Id.</u> There was no evidence that the defendant was especially close to his brother, and the defendant admitted some, but not all of the relevant facts, indicating that his will was not overborne. <u>Id.</u>

The instant case is more analogous to <u>United States v. Finch</u>,

998 F.2d 349, 355-356 (6th Cir. 1993). In <u>Finch</u>, the Sixth Circuit found the defendant's statements involuntary when the police officers executing a search warrant threatened to arrest the defendant's mother and girlfriend, without probable cause, if they found cocaine on the premises. <u>Id.</u> The fact that there was no legal basis for the threat contributed to the conclusion that the confession was involuntary. <u>Id.</u> Subsequently, in <u>United States v. Ivy</u>, the Sixth Circuit held that a defendant's consent to search his home was coerced and involuntary when, among other things, the police threatened that if the defendant did not consent to the search, everyone in the house, including the defendant's girlfriend, would go to jail and their child would be taken into protective custody. <u>See</u> 165 F.3d 397, 403 (6th Cir. 1998). The Sixth Circuit noted that, "[c]ourts have found that antagonistic actions by the police against a suspect's family taint the voluntariness of any subsequent consent." <u>Id.</u>

In any event, each case must be decided based on the totality of its unique circumstances. It is a close question whether the defendant's admission that the guns found at 452 Kempton Street were his was voluntary. However, the government has not proven by a preponderance of the evidence that his admissions were voluntary. Therefore, those statements are not admissible in the government's case-in-chief. <u>See</u> <u>Elstad</u>, 470 U.S. at 307.

III. THE MOTION TO AMEND THE MOTION TO SUPPRESS

The motion to amend the motion to suppress is also being allowed. In addition, the motion to suppress the documents seized is being allowed because the warrant did not authorize a search for documents, and the government has not proven that the plain view exception to the warrant requirement applies to the seizure of the documents at issue.

A. <u>The Particularity Clause of the Fourth Amendment</u>

This issue implicates the fundamental purpose of the particularity clause of the Fourth Amendment. The Fourth Amendment provides that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons and things to be seized." U.S. Const. amend. IV. The Supreme Court stated in <u>Coolidge v. New Hampshire</u> that there are certain constitutional interests served by the warrant requirement. 403 U.S. 443, 467 (1971). One purpose of the warrant requirement is to assure that "those searches deemed necessary should be as limited as possible." <u>Id.</u>

The primary purpose of the particularity requirement of the Fourth Amendment is to limit the discretion, and promote the accountability, of officers executing a warrant. The Supreme Court stated in <u>Marron v. United States</u> that, "[t]he requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of

one thing under a warrant describing another." 275 U.S. 192, 196 (1927). The First Circuit wrote in <u>United States v. Bonner</u> that "the manifest purpose of the particularity requirement of the Fourth Amendment is to prevent wide-ranging general searches by the police." 808 F.2d 864, 866-67 (1st Cir. 1986). As the First Circuit later explained in <u>United States v. Upham</u>:

> The requirement of particularity arises out of a hostility to the Crown's practice of issuing "general warrants" taken to authorize the wholesale rummaging through a person's property in search of contraband or evidence. The cases on particularity are actually concerned with at least two rather different problems: one is whether the warrant supplies enough information to guide and control the agent's judgment in selecting what to take.

168 F.3d 532, 535 (1st Cir. 1999).

    B. <u>Analysis</u>

In this case, the warrant authorized a search for "any and all firearms, ammunition, magazines, and ballistic related items." Ex. 4. It did not state that law enforcement agents were authorized to search for evidence of firearms crimes generally or documents specifically. <u>See</u> <u>id.</u> Documents linking Andrews to 452 Kempton Street were seized. These documents are subject to the amended motion to suppress. Specifically, they are: two photographs of the defendant (Exhibit 1 introduced on December 7, 2011); a summons to jury duty addressed to the defendant at 452 Kempton Street (Exhibit 2); and a five page notice of recall warrant addressed to the defendant at 452 Kempton Street (Exhibit 3).

ATF Special Agent Robert White found the documents in the bedroom where the guns were found. Pursuant to the NBPD's standard operating procedure, White had not read the warrant. He was briefed on the proposed search. He assumed that he was authorized and directed to search for documents linking Andrews to 452 Kempton Street, which would be evidence that the defendant possessed the guns the officers hoped to find. This was the standard practice of the NBPD in executing a search warrant.

Although there is some conflicting evidence, the credible evidence also proves the following. White was searching a bedroom after the guns were found. There were many documents in the bedroom. They were on and/or in a dresser. White had to move many of the documents in order to read all of them and determine whether they linked Andrews to 452 Kempton Street. He did so. White seized the documents that seemed to link Andrews to that address and threw the rest of them on the floor, as illustrated by Exhibit 4E.

The government has not proven that the documents seized could be seen by White when he began reading the documents. Rather, I find that White had to move many documents before he found the few that he seized. White did not find the documents at issue as part of a search for guns, firearms, or other items described in the warrant. He did not look through the many papers searching for hidden ammunition. Rather, his examination of the papers was separate and apart from the search for guns.

32

In addition, the discovery of the seized documents did not occur inadvertently while White was searching for items specified in the warrant. Rather, he mistakenly thought that the warrant authorized a search for documents providing evidence of firearms crimes and he was intentionally looking for such documents. Based on that misunderstanding, White read every seized document, including all five pages of the recall warrant document. See Ex. 3.

The warrant in this case does not describe documents with the particularity required by the Fourth Amendment. It does not expressly authorize a search for relevant documents. The government, however, argues that the documents were properly seized under the plain view doctrine. The government has the burden of proving that the plain view exception to the warrant requirement applies. See United States v. Rutkowski, 877 F.2d 139, 141 (1st Cir. 1989).

At times, the First Circuit has described the plain view doctrine as having two requirements or elements. For example, in United States v. Giannetta, the First Circuit wrote:

> The plain view doctrine allows police to seize the object, even though it is not specified in the warrant, if two requirements are met. First, the police must have a prior justification for being in a position to see the item in plain view. Phrased another way, the police must not have exceeded the permitted scope of their search in uncovering the item. Second, the incriminating nature of the item must be immediately apparent to the seizing agent. "Immediately apparent" has been defined as probable cause to believe the item is contraband or evidence of a crime.

909 F.2d 571, 578 (1st Cir. 1990). However, <u>Giannetta</u> cited <u>Rutkowski</u>, which described the plain view test as follows: "The exception applies if three criteria are met. First, the officer's presence at the point of discovery must be lawful. Second, discovery of the item seized must be inadvertent. Third, the item's evidentiary value must be immediately apparent to searchers." 877 F.2d at 140-141.

More recently, the First Circuit wrote, in <u>United States v. Paneto</u> that:

> [a] police officer, even though he does not have a search warrant, may seize an object in plain view as long as he has lawfully reached the vantage point from which he sees the object, has probable cause to support his seizure of that object, and has a right of access to the object itself. A challenge to a search of an object in plain view calls for a slightly different analytic rubric. When an officer seeks to manipulate an object in plain sight, the relevant inquiry becomes whether "the plain view doctrine would have sustained a seizure of the object itself."

661 F.3d 709, 713 (1st Cir. 2011) (citing <u>Arizona v. Hicks</u>, 480 U.S. 321, 326 (1987)) (some internal citations omitted).

In this case, the warrant authorized White to be in the bedroom to search for firearms and certain other specified items. However, the government has not proven that the documents seized were initially in plain view while he was looking for guns. Rather, I find that many documents had to be moved to discover the few that were seized, and they were not moved as part of a search for items specified in the warrant. Instead, documents were moved and read

under the mistaken belief that the warrant authorized a search for documentary evidence.

The movement of the documents was a search, as a search is defined in <u>Arizona v. Hicks</u>. <u>See</u> 480 U.S. 321, 324-325 (1987). In <u>Hicks</u>, an officer's moving of equipment to view "concealed portions of the apartment or its contents" when the action was "unrelated to the objectives of the authorized intrusion" was characterized as a separate, independent "search." <u>Id.</u>

In <u>Paneto</u>, officers saw a $20 bill lying on a table and picked it up to examine it. <u>See</u> 661 F.3d at 714, n.3. The First Circuit stated that, "[i]t is clear that the Fourth Amendment forbids handling an item to expose something hidden" and contrasted such a search with "moving an item merely to magnify or confirm something already visible." <u>Id.</u>

In <u>Paneto</u>, 661 F.3d at 714, the $20 bill at issue was immediately visible to the naked eye and there was probable cause to move it. In contrast, in the instant case the documents seized were not discovered until a search, not authorized by the warrant, of a group of documents was conducted without probable cause. In essence, the officer here exceeded the scope of the search permitted by the warrant in uncovering the seized items. The First Circuit held in <u>Giannetta</u> that for the plain view doctrine to apply, "the police must not have exceeded the permitted scope of their search in uncovering the item." 909 F.2d at 578. Therefore,

the search that revealed the seized documents in the instant case is not protected by the plain view exception to the warrant requirement.

In addition, in contrast to the $20 bill in <u>Paneto</u>, except for the photographs, the incriminating nature of the seized documents was not immediately apparent to White. Rather, he had to read all the documents in order to conclude that there was probable cause to believe that the few documents that he decided to seize were evidence of a crime. This case is analogous to <u>United States v. Garcia</u>, 496 F.3d 495, 510-511 (6th Cir. 2007). In <u>Garcia</u>, the warrant authorized a search for cocaine, but not documents. <u>Id.</u> at 501. The Sixth Circuit suppressed the documents seized because the agent had to read every document to decide whether any of them had evidentiary value. <u>Id.</u> at 511. Therefore, the Sixth Circuit held that the criminal nature of the seized documents was not immediately apparent. <u>Id.</u> In essence, the Sixth Circuit reasoned that to apply the plain view exception to save the seizure of documents in <u>Garcia</u> would "extend a particularized search authorized by Fourth Amendment principles into an unlawful exploratory search." <u>Id.</u> at 510.

In <u>Hicks</u>, the Supreme Court wrote:

It matters not that the search uncovered nothing of any great personal value to respondent - serial numbers rather than (what might conceivably have been hidden behind or under the equipment) letters or photographs. A search is a search, even if it happens to disclose nothing but the bottom of a turntable.

480 U.S. at 325. In contrast to <u>Hicks</u>, this case involves the seizure of documents at the heart of the interests protected by the particularity clause of the Fourth Amendment. To permit those seized documents to be introduced as evidence in this case would abet the type of general searches that the Fourth Amendment prohibits and would seriously erode the vitality of its particularity clause. In any event, the government has not proven that the plain view exception to the warrant requirement applies. Therefore, the motion to suppress the seized documents is being allowed.

IV. ORDER

In view of the foregoing, it is hereby ORDERED that:

1. The Motion to Suppress Evidence (Docket No. 26) is ALLOWED.

2. The Motion to Amend Motion to Suppress Evidence (Docket No. 107) is ALLOWED and the documents at issue are suppressed.


<u>    /s/ Mark L. Wolf    </u>
UNITED STATES DISTRICT JUDGE